UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR BALLESTEROS,<br>Petitioner,<br>vs.<br>BEN CURRY, Warden,<br>Respondent. | No. C 07-1421 MMC (PR)<br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

On March 12, 2007, petitioner Victor Ballesteros, a state prisoner proceeding pro se, filed, pursuant to 28 U.S.C. § 2254, the above-titled petition for a writ of habeas corpus. For the reasons stated herein, the petition is hereby DENIED.

## BACKGROUND

On December 16, 1989, petitioner used a .22 caliber firearm to shoot the victim, Raul Contreras, four times at very close range, thereby killing him. (Ans. Ex. D at 1.) In 1990, pursuant to a plea agreement, petitioner pleaded guilty to one count of second degree murder and received a sentence of fifteen years to life in prison. (Id. Ex. A at 1–3; Pet. Ex. 3 at 1–2.) On April 11, 2006, the Board of Parole Hearings ("Board") found petitioner unsuitable for parole, on the ground that he "would pose an unreasonable risk of danger to society and a threat to public safety if released from prison." (Ans. Ex. C at 62.)

In reaching its decision, the Board accepted and incorporated by reference the following facts taken from a report prepared for a 2004 parole hearing:

> On December 17, 1989, at approximately 7:00 a.m., the body of the victim, Raul Contreras, was found on the side of the road on Lake Street . . . in an unincorporated area in Hemet, California. An autopsy . . . indicated that the victim had been shot four times with a .22 caliber gun. [The victim] had wounds in the cheek, on the top of the head and two wounds in the back of the neck. All of the shots had been fired at very close range. In the afternoon of December 17, 1989, Dorothy Tran reported her common-law husband, [the victim], missing. . . . Tran admitted that [petitioner] and Irene Manriquez admitted to her that they had killed [the victim] . . . in response to Tran's repeated statements that she would like him to be killed due to his extreme abusive treatment of her and her children. Tran said that when they asked for payment, she gave them the Ford pick-up. On December 19, 1989, [petitioner] was arrested in possession of the Ford pick-up. . . . On the same day, Manriquez was interviewed . . . [and] admitted to participating in the killing of [the victim]. She said that she and [petitioner] lived in an apartment adjacent to [the victim] and Tran. Tran had often complained about [the victim's] abusive treatment of her and her children. On December 15, 1989, Trans [sic] asked if they knew someone who would kill [the victim] and offered to pay for it being done. Later that evening, Manriquez and [petitioner] obtained a .22 caliber handgun. . . . The next day, December 16, 1989, they approached [the victim] and asked him for a ride to a local grocery store. Tran had advised them that [the victim] would have between $300.00 and $400.00 with him and they could keep the money if they killed him. They drove to a location between Lake and Hemet Streets and demanded that [the victim] give them all his money. He stopped the car, emptied his pockets and showed them that he had no money. Manriquez got out of the car and [the victim] fled from the parked car. [Petitioner] pursued [the victim] who suddenly charged him. [Petitioner] shot him several times. [Petitioner] and Manriquez left in the victim's vehicle and returned to their apartment. They advised Tran what had happened, she gave them $42.00 then and $122.00 later that day. Manriquez and [petitioner] parted company and met later in Riverside. Manriquez asked [petitioner] what he had done with the victim's car and the gun. He replied[,] "don't worry about it, it is somewhere where it won't be found."

(Id. at 10–11; Ex. D at 1–2.) When the Board described the commitment offense as a "murder for hire," petitioner insisted that he did not kill the victim for hire or for financial gain. (Id. Ex. C at 10–12.) Petitioner admitted that he shot the victim and acknowledged that it was wrong, but he maintained that he did it "for what [the victim] was doing to Dorothy and her kids," and because he "wanted to be acting like the [tough] guy that [he] was trying to portray out there in the streets" for his girlfriend, Irene Manriquez. (Id. at 12.)

.

At the parole hearing, the Board reviewed petitioner's record, including the circumstances of his commitment offense, his criminal history, his social history, his parole plans, and his behavior in prison. In addition, the Board considered whether petitioner demonstrated any feelings of remorse.

The Board found the commitment offense to be "one for hire and one for gain." (Id. at 62.) The Board noted that the offense was "callous and cold" and "carried out in a cruel and calculating manner," demonstrating that petitioner "had no regard for [the victim's] life." (Id. at 62–63.) The Board further noted that not only was the crime an "execution-style murder" of a person whom petitioner had befriended and who trusted petitioner, but also that petitioner had tried to "pass the blame off onto other people." (Id. at 62.)

Although petitioner does not have a juvenile record, his adult criminal history, as the Board noted, is significant. In addition to his conviction for the commitment offense, petitioner's criminal history includes convictions for carrying a loaded firearm in a public place, taking a vehicle without the owner's consent, possession and being under the influence of a controlled substance (methamphetamine) and receiving stolen property. (Id. at 14–17, 63–64.) Additionally, petitioner conceded that his substance abuse had started when he was approximately twenty years old and that it had continued until the time of his arrest for the commitment offense. (Id. at 16.)

In reviewing petitioner's social history and parole plans, the Board acknowledged that petitioner had plans to live in a house with his mother, brother, and sister-in-law upon his release (id. at 21), that petitioner had "a large family support system" (id. at 26), and that petitioner had secured two job offers (id. at 21, 22).

In examining petitioner's behavior in prison, the Board noted that petitioner had committed two disciplinary infractions — one in 1987 for altering documents (id. at 41), and a second, more serious, rules violation in 1998 for possession of methamphetamine (id. at 40–41, 67). The Board acknowledged, however, petitioner's accomplishments in various inmate vocational and educational programs and recognized that petitioner had

engaged in several self-help programs. (Id. Ex. C at 30–39.) In particular, as the Board noted, petitioner had attended NA and AA programs, had completed Project Change for a second time, and demonstrated for the Board that he had an understanding of the "12 Steps." (Id. at 37– 39.) Finally, the Board made note that petitioner's latest psychological report was positive (id. at 42-45) and, in particular, cited to the portion of the report wherein the evaluator opined that petitioner "would be considered no higher a risk for violence than the average citizen within the community" (id. at 44–45).

After a full hearing and consideration of all of the above evidence, the Board found petitioner unsuitable for parole. (Id. Ex. C at 62.) In response to the Board's determination, petitioner filed state habeas petitions in the Riverside County Superior Court, California Court of Appeal, and California Supreme Court, each of which was denied (Id. Exs. L, M, N.)

On March 4, 2007, petitioner filed the instant federal habeas petition, claiming (1) the Board violated his right to due process by basing its decision to deny him parole on "unreliable evidence" and by failing to take into account factors favorable to granting him parole and (2) because the Board denied him parole, respondent violated his plea agreement, and consequently, his right to due process.

## DISCUSSION

### A. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)).

A district court may not grant a habeas petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-406. An "unreasonable application" of federal law occurs "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Under the "unreasonable application" clause, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable," a determination that requires the state court decision to be more than "an incorrect or erroneous application of federal law." Id. at 409, 412. A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254 (e)(1).

In determining whether to grant a petition, the district court must analyze the state court's "last reasoned decision." See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005). Here, the "last reasoned decision" is the Riverside County Superior Court's order denying petitioner's petition for a writ of habeas corpus. (See Ans. Ex. L at 1–2.)[1] For the reasons stated below, the state court's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, nor was the state court decision based on an unreasonable determination of the facts.

[1] The California Court of Appeal and the California Supreme Court summarily denied the petitions filed respectively therein. (Ans. Exs. M, N.) Where there is no reasoned opinion from the highest state court to have considered the petitioner's claims, the district court, in considering the basis for the state court's judgment, will "look through" the unexplained decisions to the last reasoned state court decision. See Nunnemaker, 501 U.S. at 801–06; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) .

**B. Petitioner's Claims**

**1. Sufficiency of Evidence**

Petitioner claims the Board violated his constitutional right to due process by denying him parole in 2006 because the Board based its decision on unreliable evidence and "failed to consider a single factor favoring suitability for parole." (Pet. at 16.) Specifically, petitioner asserts, the Board violated his right to due process by (1) continuing to rely on his commitment offense, which occurred seventeen years prior to the 2006 parole hearing; (2) continuing to rely on his history of methamphetamine abuse, and, in particular, on the disciplinary infraction he received eight years prior for possession of methamphetamine; and (3) failing to consider all relevant factors. (See id. at 16–19, 22–24.) The superior court rejected petitioner's claim, finding "[t]he record clearly reflects that the Parole Board . . . acted within its authority in denying his parole." (Ans. Ex. L at 1.) In particular, the superior court observed that the Board had "made clear that its decision would be based upon the nature of the crimes for which defendant was committed, his prior criminal history, his prior social history, his behavior and programming since his commitment and his plans if released," and concluded that the Board's decision demonstrates such factors were "carefully considered." (Id.)

In California, prisoners have a federally protected liberty interest in parole. See Sass v. Calif. Bd. of Prison Terms, 461 F.3d 1123, 1127-28 (9th Cir. 2006) (citing McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002)). According to "clearly established" federal law, a parole board's decision to deny an inmate parole complies with due process where there is "some evidence" to support the board's decision. See Superintendent v. Hill, 472 U.S. 445, 454–55 (1985); Sass, 461 F.3d at 1128. Under the "some evidence" standard, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the [ ] board." Hill, 472 U.S. at 455–56. In addition, the evidence underlying the parole board's decision must have "some indicia of reliability." See McQuillion, 306 F.3d at 904. Accordingly, if a parole board's determination with respect to parole suitability is to satisfy due process, such a

determination must be supported by "some evidence" having "some indicia of reliability." Id.

In assessing whether there is "some evidence" to support a board's denial of parole, this Court must not only examine the record, but also must consider the regulations that guide the parole board in making its parole suitability determination. Pursuant to such regulations, "[t]he panel shall first determine whether the life prisoner is suitable for release on parole[;] [r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. 15 Cal. Code Regs.
§ 2402(a). The regulations enumerate various circumstances tending to indicate whether or not an inmate is suitable for parole.[2] Id. § 2402(c)–(d). In addition to those enumerated factors, the Board is to consider "all relevant, reliable information available." Id. § 2402(b).

Guided by the regulations, the task of the parole board is to determine whether the prisoner would be a danger to society if he or she were released on parole. See In re

---

[2] The circumstances tending to show unsuitability for parole include: (1) the commitment offense was committed in an "especially heinous, atrocious or cruel manner;" (2) previous record of violence; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors such as a "lengthy history of severe mental problems related to the offense;" and (6) prison misconduct. 15 Cal. Code Regs. §2402(c). Factors to be considered in determining whether the offense was committed "in an especially heinous, atrocious or cruel manner" include: (A) multiple victims were attacked, injured or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) the motive for the crime is inexplicable or very trivial in relation to the offense. Id. The circumstances tending to show suitability for parole include: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) commitment offense was committed as a result of stress which built up over time; (5) Battered Woman Syndrome; (6) lack of criminal history; (7) age is such that it reduces the possibility of recidivism; (8) plans for future including development of marketable skills; and (9) institutional activities that indicate ability to function within the law. Id. § 2402(d).

Lawrence, 44 Cal. 4th 1181 (2008). A parole authority's continued reliance on the circumstances of the commitment offense as the sole basis for denying parole, however, can, over time, raise due process concerns. See Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003); Irons v. Carey, 505 F.3d 846, 854 (9th Cir. 2007) (noting that "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes"). Consequently, the constitutional "some evidence" standard requires that there exists some evidence that the prisoner constitutes a danger to society, not simply that there exists some evidence of one or more of the factors listed in the regulations as considerations appropriate for parole determination. In re Lawrence, 44 Cal. 4th at 1205–06.

Here, the Court cannot find that the state court was unreasonable in concluding there is some evidence to support the Board's determination that petitioner would pose a danger to society if released.

First, evidence exists to support the Board's determination that the circumstances of the commitment offense indicate that petitioner presented a risk of danger to society if released. The record contains evidence that the commitment offense was committed in an "especially heinous, atrocious or cruel manner," a circumstance tending to show parole unsuitability. See 15 Cal. Code Regs. § 2402(c). Petitioner and the victim were not strangers, and the victim placed his trust in petitioner when he agreed to give him a ride to the grocery store. (Ans. Ex. D at 1.) In repayment for that courtesy, petitioner, at close range, shot the victim four times in the head. (Id.; Ex. C at 62.) Thus, as the Board observed, not only was the crime an "execution-style murder," but it also was the murder of a person whose trust petitioner had gained. As described by the Board, the crime was a "murder for hire" (id. Ex. C at 10); specifically, petitioner had agreed to kill the victim in exchange for a Ford pick-up truck and $164.00 (id. Ex. D at 2). Moreover, petitioner's additional motivation, to appear "tough" in front of his girlfriend (id. at 11, 12), can only be described as "trivial in relation to the offense." See 15 Cal. Code Regs. § 2402(d).

Further, after petitioner was caught and put in jail, he denied being the shooter and had tried to blame the murder on others. (Ans. Ex. C at 50–51.) Under such circumstances, the Board's conclusion that petitioner carried out the crime in a "cruel and calculating manner" that demonstrated a "callous disregard for human suffering" was not unreasonable. (Id. at 62, 63.) While petitioner is correct to point out that the circumstances of the commitment offense can, over time, cease to have probative value and that a parole board's continued reliance on the commitment offense as the basis for denying parole can raise due process concerns, Biggs, 334 F.3d at 916, in the instant case, the circumstances of the crime constitute some evidence of petitioner's dangerousness.

Additionally, the Board's consideration of petitioner's criminal history and institutional behavior provided support for its determination to deny parole. The record, as noted, shows that petitioner's criminal history includes convictions for carrying a loaded firearm in a public place, taking a vehicle without the owner's consent, possession and being under the influence of methamphetamine and receiving stolen property. (Ans. Ex. C at 14, 64.) Petitioner also had been involved in an incident of spousal abuse. (Id. at 54, 63.) The Board emphasized the significance of petitioner's use of methamphetamine, both in connection with his prior crimes and as an impediment to his rehabilitation (id. at 63-64), and was concerned that petitioner had possessed and used methamphetamine while in prison (id. at 40-41, 64), a violation that was "too close [for] comfort" (id. at 64). The Board's determination that, as of the time of the hearing, petitioner had not sufficiently resolved his drug problem is supported by some evidence, and contradicts petitioner's assertion that the Board relied solely on the circumstances of the commitment offense.

Contrary to petitioner's assertion, the Board also considered factors that weighed in petitioner's favor. The Board acknowledged that petitioner "ha[d] done an outstanding job in [his] programming" while in prison. (Id. at 64.) The Board did express, however, a concern that petitioner was "playing the game in the penitentiary by filling [his] file full of certificates and programs and promises," and was not sure whether petitioner "was

programming for [himself]" or "programming for [the Board]." (Id. at 64–65.)

Further, the Board noted, petitioner's body language and certain reactions during the hearing displayed the "arrogance that [petitioner had] talked about trying to get rid of"; consequently, the Board was not convinced that petitioner was genuinely remorseful or had truly accepted the reality of what he had done to the victim's family. (Id. at 63, 65.)

In sum, because the Board's decision is supported by evidence in the record, petitioner's claim that the Board's decision violated his right to due process is without merit.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**2. Plea Agreement**

Petitioner claims respondent violated his rights under his plea agreement by denying him parole. (Pet. at 19.) Specifically, petitioner contends respondent breached the terms of petitioner's plea agreement by arbitrarily treating his commitment offense as a first degree murder rather than as the second degree murder for which he was convicted (id. at 20-22), and that respondent violated petitioner's plea agreement by not releasing him within the "legislatively prescribed sentencing range" for second degree murder (id. at 20) (citing to 15 Cal. Code Regs. § 2403(c)); see 15 Cal. Code Regs. § 2403(c) (providing base term "matrix").

"[D]ue process rights conferred by the federal constitution allow [a defendant] to enforce the terms of [his] plea agreement." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003). Plea agreements are construed using the ordinary rules of contract interpretation. See id. at 1159. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled." See Santobello v. New York, 404 U.S. 257, 262 (1971); see also Brown, 337 F.3d at 1159 (holding prosecutor's promise, specifically, that petitioner would be released on parole after serving half the minimum sentence discipline-free, was binding).

Here, petitioner's claims are without merit. The record clearly reflects that the Board knew the crime for which petitioner was convicted and that it acted within its authority in denying him parole. As discussed above, the Board carefully considered the circumstances surrounding the commitment offense, petitioner's criminal history, his prior social history, his institutional behavior and programming, and his plans if released, and its decision to deny parole was not in violation of petitioner's constitutional rights. Consequently, to the extent petitioner argues his constitutional rights constitute implied terms of his plea agreement, those terms have not been breached. Similarly, petitioner's continued custody does not constitute a breach of the express terms of the agreement on which petitioner relies, specifically, that he receive a sentence for second degree murder. Lastly, the Board is under no duty to apply the sentencing matrix once it has determined a prisoner is unsuitable for parole. See In Re Dannenberg, 34 Cal. 4th 1069, 1071 (2005); see also 15 Cal. Code Regs. § 2403(a) (requiring base term be set "for each life prisoner who is found suitable for parole").

Accordingly, petitioner is not entitled to habeas relief on this claim.

**CONCLUSION**

Because the record contains some evidence to support the Board's determination that petitioner would present an unreasonable risk of danger to society if released, and because petitioner has made an insufficient showing as to his entitlement to relief as his second claim, the Court finds the state court's determination was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, nor can the Court say it was based on an unreasonable determination of the facts.

Accordingly, the petition for a writ of habeas corpus is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

DATED: February 26, 2010

MAXINE M. CHESNEY
United States District Judge